IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ANTHONY MICHAEL FORD                                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:19-CV-05170**

CORPORAL STAMPS; DEPUTY TAYLOR;
PRICE; DEPUTY OTTS; DEPUTY VISION;
SERGEANT BANTA; and CAPTAIN GUYLL            **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This is a civil rights action filed pursuant to 42 U.S.C. § 1983.   Plaintiff Anthony M.

Ford ("Ford") proceeds *pro se* and *in forma pauperis*.   While he was detained in the

Benton County Detention Center ("BCDC"), Ford maintains that his constitutional rights

were violated on July 11, 2019, when excessive force was used against him, he was

verbally abused, and he was denied due process.

Defendants filed a Motion for Summary Judgment on June 4, 2020.   (Doc. 32).

Ford responded on July 27, 2020.   (Doc. 47).   At the direction of the Court (Doc. 50),

Defendants filed a Supplement (Doc. 51) to their Summary Judgment Motion.   The

Motion is now ready for decision.

## I.      BACKGROUND

Ford was booked into the BCDC on November 13, 2018.   (Doc. 34-2 at 2).[1]   He

remained a pretrial detainee until September 19, 2019.   *Id.* at 7.

---

[1] All citations are to the ECF document and page number rather than to the exhibit
numbers.

## A.    Ford's Account of the July 11, 2019 Incident

According to Ford, a guard went upstairs to the public restroom and opened the door while an inmate was using the facilities.   (Doc. 34-9 at 19-20).   Ford and several other unidentified inmates made comments about the guard "using his power as a way to violate [the inmate's] rights as an individual for privacy." *Id.* at 20.   Ford was the only individual pulled out for making the comment. *Id.*   Ford testified that Corporal Stamps and Deputy Price removed him from the pod and told him to face the window and put his hands behind his back. *Id.* at 20-21.   The deputies asked Ford what was going on and why he was giving them problems. *Id.* at 21.   When Ford started explaining that one of the guards had violated an inmate's rights, Corporal Stamps began to "scream in [his] face." *Id.*   Ford told Corporal Stamps, "I don't have nothing to say to you . . . . If you're going to sit here and yell at me, there's no point for me to have a conversation with you." *Id.*   At that point, Corporal Stamps replied that they would go to the recreation ("rec") yard and Ford could speak with him personally. *Id.*   Ford took this as a threat. *Id.* at 21.

Ford believed Corporal Stamps wanted to get him out of earshot of all the other officers so that no one could hear what was said. *Id.*   The rec yard had no cameras. *Id.* at 22.   Ford testified that Corporal Stamps then began to use foul language and asked Ford who he thought he was. *Id.* at 23.   Ford testified that Corporal Stamps was verbally abusive. *Id.*   Ford did not talk to him except to say, "If you're going to sit there and speak like that to me, I ain't got nothing to say to you." *Id.*

After that, Corporal Stamps indicated that he was going to put handcuffs on Ford. *Id.* at 23.   Ford testified that he refused to turn around and Corporal Stamps had to force

him to turn around and then slammed him into the wall. *Id.* at 24–25. Ford claims that Corporal Stamps used the handcuffs as a weapon by fastening them on his wrists as tightly as possible. *Id.* at 24. Ford testified that he ended up with bruising and cuts around his wrists that lasted two to three weeks. *Id.* at 27. The injuries were not treated by medical staff. *Id.*

Corporal Stamps then advised Ford that he would be taken to E-Pod, which is the lockdown unit. *Id.* at 23. As Corporal Stamps and Deputy Price were escorting Ford, he testified that Corporal Stamps began pushing down on his shoulder and wrists, which caused "sheer pain." *Id.* at 23, 31. Ford stated it felt like Corporal Stamps was trying to pull his arm out of its socket and that Deputy Price was pulling him up while Corporal Stamps was pulling him down. *Id.* At that point, Ford stopped walking and let his weight take him down to the floor. *Id.* at 30. Corporal Stamps and Deputy Price basically carried him down the rest of the hallway. *Id.* at 30. Ford testified that he started walking again a couple of seconds later when headed towards E-Pod. *Id.* at 32.

When they reached the control room of the jail, Ford claims he was taken down to the floor. Ford maintains that he did not put his legs in front of Corporal Stamps and Deputy Price prior to being taken to the floor. *Id.* at 45. According to Ford, the officers put enough pressure on his "shoulders and stuff to where they slammed [him] on the ground." *Id.* at 33. Ford testified that he was screaming for help and saying he was in pain. *Id.* at 46. The pain was located in his knees, shoulders, wrists, and back. *Id.* at 47. Other officers arrived and put pressure on each of Ford's limbs and on different parts of his body. *Id.* at 33. Ford believed there were nine officers involved. *Id.* at 47. Ford questioned the need for so many officers when he was already handcuffed. *Id.* He

testified that at some point, he was kicked or kneed in the face. *Id.* at 33. An officer put his knee on Ford's head near his right temple. *Id.* at 51. At the time, Ford was wearing his glasses, and the pressure of the officer's knee on Ford's temple caused the glasses to scratch Ford's nose and the area near his eyes. *Id.* at 52. He contends he was punched in the ribs and in the liver or kidneys. *Id.* at 50. Someone sat on his face even though he was handcuffed and face down on the ground. *Id.* at 34. Ford claims he tried to move or roll in an attempt to get out from underneath the officers. *Id.* at 48. He was told to stop moving but said he could not do that because he was being injured. *Id.* at 74.

Ford testified that after all that, he was "slammed" into the restraint chair. *Id.* at 34. Deputy Taylor grabbed Ford underneath his chin and "yanked up" on his jaw so he could not talk. *Id.* The officers, including Deputy Taylor, were all verbally abusing him. *Id.* at 34, 66. Ford conceded that he was "kind of screaming." *Id.* at 35. After a while, they moved the chair "to booking and sat [him] in front of everybody, kind of humiliated [him]." *Id.* at 35. Ford believes the fact that he was still in handcuffs constituted punishment since the restraint chair was sufficient to "stop whatever [he] was doing." *Id.* at 36.

While he was in the restraint chair, Ford recalled Deputy Otts and Deputy Vision making comments about him. *Id.* at 37. Sergeant Banta was there but did not say much. *Id.* at 40. Ford testified that Sergeant Banta, Deputy Otts, and Deputy Vision were all involved in restraining Ford on the floor. *Id.* at 40, 67–69. Ford testified that Deputy Vision was the main officer using foul language and calling him a "bitch" because

4

of his dermal.[2]   *Id.* at 37.   Ford testified that he responded to the officers' abuse by calling them "all pieces of shit."   *Id.* at 57.

The dermal was bleeding because "they almost tore it out of [his] face."   *Id.* at 37. The blood was "leaking out from underneath the dermal."   *Id.*   When a nurse came up to attend to it, Ford told the nurse to get away from him.   *Id.* at 39.   He cleaned the blood off the dermal when he got back to his cell.   *Id.*   Ford estimated he was in the restraint chair for approximately thirty minutes but indicated it could have been longer.   *Id.* at 43.

According to Ford, Sergeant Banta and another officer took pictures of Ford's injuries.   *Id.* at 52, 58.   Ford believed some pictures were taken while he was in the restraint chair and some after he was placed in his cell.   *Id.* at 53.   Ford testified that although he had money in his prisoner account, he did not want to pay the $10 charge to see the doctor.   *Id.* at 59.

After Ford was let out of the restraint chair, Corporal Stamps brought him a disciplinary citation.   *Id.* at 43.   Ford believed he pled guilty to the charges.   *Id.* at 44. After this incident was over, Ford testified that he was "scared that officers" were "going to attack" him rather than just talk to him.   *Id.* at 63.   He testified that he no longer believes that the officers are there to protect him and thinks instead that they have grudges against him.   *Id.*

### B.   Defendants' Accounts of the July 11, 2019 Incident

On July 11, 2019, Corporal Stamps submitted the following incident narrative regarding the encounter with Ford:

> I, Corporal Stamps, was helping in D-Pod.   At approximately 0700 hours there was some shouting coming from D154.   I went to the Pod door with

---

[2] A facial piercing.

Deputy Price.   Deputy Price ordered an inmate, later identified as Ford . . . to come to pod control.   Inmate Ford immediately began shouting at Deputy Price saying something about being singled out.   I stepped into D154 and ordered Inmate Ford to come out to pod control so I could speak with him.   Inmate Ford was already verbally aggressive so I ordered him to face the wall and place his hands behind his back.   I attempted to ask Inmate Ford what was going on but he [was] just yelling and being verbally aggressive so I made the decision to place him in the rec yard to try [to] have a calm conversation.

While in the rec yard Inmate Ford continued to be verbally aggressive so I made the decision to place him in hand restraints and escort him to E-Pod for lock down for disruptive conduct.   I ordered inmate Ford to face the wall and place his hands behind his back, he complied.   I began to escort him to E-Pod.   While still in the D-Pod hall Inmate Ford was attempting to provoke us by calling us "faggot ass bitches" among other profane remarks. Inmate Ford dropped to his knees and refused to walk.   I took control under his right arm and carried him with Deputy Price after a moment he put his feet back under himself and resumed walking on his own.   As we were walking through the D-Pod slider Inmate Ford began screaming as loud as he could and dropped all his weight to the floor, Deputy Price and I went with him to the floor.

Once on the floor Inmate Ford began actively resisting trying to use his legs to wrap the legs of Deputy Price and turn to face us while verbally threatening us with physical violence.   Inmate Ford was ordered repeatedly to stop resisting and get flat on his stomach.   I took control of Inmate Ford's head and then moved to his legs to try to get him rolled over to his stomach. Inmate Ford was not being compliant and showed no signs of becoming compliant so I made the Decision to place him in the restraint chair.   Inmate Ford was placed in the restraint chair and moved to booking to be observed. Nursing staff came to booking to evaluate Inmate Ford, when she began speaking to him he stated "don't f------ touch me."   Fifteen minute restraint checks were done to verify circulation.   Inmate Ford was removed from the restraint chair at approximately 0755 hours.   I escorted Inmate Ford to Cell 4 to calm down before escorting him to E-Pod for lock down.   Later in the day Inmate Ford was seen and cleared by medical staff.   I am Locking Inmate Ford down for A17 "active resistance," A4 "Assault and battery or threatening and B1 "disruptive conduct.   An inventory [of] Inmate Ford's property was taken and stored in E-Pod closet.

(Doc. 34-5 at 1) (paragraph breaks added).

Deputy Otts's incident report states that when he first arrived in the main hallway,

he saw Ford, Corporal Stamps, and Deputy Price struggling on the floor, and Ford was

actively resisting.  *Id.*  Deputy Otts observed Ford attempting to twist Deputy Price's lower leg.  *Id.*  Deputy Otts "then dropped [his] right knee into Ford[']s[] right thigh."  *Id.* Ford's legs went straight, releasing Deputy Price.  *Id.*  Because Ford continued to try to turn over, Deputy Otts took control of Ford's head.  *Id.* at 2.

Deputy Taylor in his report states that he ran into the hallway after hearing screaming.  He saw Ford resisting and ran over to assist the other deputies by gaining control of Ford's legs.  *Id.*  Deputy Taylor indicated that Ford was placed in leg restraints and then taken to the restraint chair.  *Id.*  Ford continued to resist as deputies were placing him in the chair.  *Id.*  Deputy Taylor "gained control of [Ford's] head by placing [his] fingers underneath both sides of his jaw and lifting his head up."  *Id.*  Once Ford was secured, Deputy Taylor rolled him to booking where the chair was placed in direct view of the cameras and restraint checks were performed.  *Id.*

Deputy Price wrote in his report that Deputy Stephens went into D-pod to retrieve an inmate from the public restroom.  Deputy Price could hear another inmate "being disruptive and yelling at Deputy Stephens from across the pod."  *Id.*  Deputy Price recognized the disruptive inmate as Ford and asked him to come out to pod control.  *Id.* Ford complied but continued to be disruptive and began shouting profanities at Deputy Price.  *Id.*  Corporal Stamps escorted Ford to the rec area, and Deputy Price observed the two men talking.  Then he saw Corporal Stamps handcuff Ford and lead him back into the hallway.  Ford continued to yell profanities, so Deputy Price followed Ford and Corporal Stamps as they made their way down the hall.  At some point, Ford refused to walk and went to his knees.  *Id.*  Deputy Price ran up to assist and "gained positive control" on Ford's "left side and began carrying him."  *Id.*  Ford put his feet down and

walked until they all reached central control.   Once there, Ford fell to the floor and began resisting.   He wrapped his legs around Deputy Price's "ankle and began twisting it."   *Id.* As deputies arrived on the scene to help, Deputy Price requested that they gain control of Ford's legs.   *Id.*   Deputy Price was then able to get his ankle free, but Ford continued to resist.   *Id.*   Leg restraints were placed on Ford.   *Id.*

Deputy Vinson's incident report states that he was informed by central control that he "needed to assist other deputies with a combative inmate."   *Id.*   The restraint chair had been requested due to Ford being "verbally aggressive and disruptive."   *Id.*   Deputy Vinson helped Ford to his feet and "sat him down in the restraint chair."   *Id.*   Deputy Vinson secured Ford's right leg to the restraint chair.   *Id.*   According to Deputy Vinson, "[d]uring the whole process Inmate Ford was threatening all deputies involved."   *Id.* Ford was taken to booking in the restraint chair.   *Id.*

### C.   Video of the July 11, 2019 Incident[3]

#### 1.   D-Pod Hallway

7:05:09 Corporal Stamps and Ford enter the rec yard.   A portion of Corporal Stamps's body can be seen through the glass on the door.   There are infrequent glimpses of Ford.

7:06:10 Ford is standing to the right side of the camera angle.   Corporal Stamps handcuffs him.

7:06:27 Ford handcuffed walks through the door followed closely by Corporal Stamps.   Corporal Stamps and Ford proceed down the hallway followed by Deputy Price.

7:06:36 Ford drops to the floor with his knees bent.   Corporal Stamps and Deputy Price each take Ford under his arms at the shoulder and continue down the hallway.   Ford is essentially being dragged down the hallway on his knees.   A third officer is following behind.

---

[3] The video, which is located in the record at Doc. 34-7, consists of several files.   There is no audio.



7:06:53 the officers and Ford pass out of view of this camera.

## 2.   Central Control

7:06:56 The officers and Ford enter the room with Ford walking on his own.

7:06:58 Ford sticks his legs straight out in front of him in an apparent effort to resist the officers.



7:06:58 Corporal Stamps, Deputy Price, and Ford all fall to the floor.



7:07:02 Ford is clearly wrestling with the officers and appears to be attempting to wrap his legs around Deputy Price's ankle.

7:07:11 Three additional officers arrive to assist.  One officer is at Ford's feet.  Corporal Stamps is by Ford's upper body kneeling.  Ford continues to struggle, and the other officers go to the floor to assist.



2019-Jul-11 07:07:16.575 AM (CDT)



7:08:38 An officer arrives with leg restraints.

7:09:44 Three more officers arrive.

7:10:25 The restraint chair is brought in.   There are now twelve officers in the immediate area.



7:10:45 Ford is lifted off the floor and placed in the restraint chair with handcuffs and leg restraints on.



7:11:12 Deputy Taylor, who is standing behind the restraint chair, puts his hands on each side of Ford's jaw under his chin and holds this position.

7:12:10 Taylor releases Ford's jaw.

7:12:29 The restraint chair is wheeled out of view.

3.    **Booking**

7:13:36 The restraint chair is wheeled into booking.   Ford is accompanied by seven officers at this point.

7:14:13 The restraints are checked.   At this point, Ford's hands are still handcuffed behind his back.

7:16:36 Someone from medical arrives.

7:16:50 A nurse approaches Ford and almost immediately turns around and walks away.

7:26:16 Ford's handcuffs are removed, and his arms are placed in restraints.   The other restraints are checked.

7:36:39 An officer moves the restraint chair slightly forward and appears to be talking with Ford.   The conversation continues for several minutes.

7:43:34 The officer approaches the chair and checks the shoulder restraints.

7:50:15 An officer appears to adjust the shoulder restraints.

7:54:36 Two officers approach the restraint chair. After talking with Ford, the officers begin removing the restraints.

7:55:31 Ford stands up.   He is given his glasses and his footwear and walks out of booking.

### D.   Due-Process/Official-Capacity Claim

According to Ford, Captain Guyll had been consistently allowing his officers to use excessive physical force against pretrial inmates.   (Doc. 34-9 at 74-75).   Ford maintains that Captain Guyll was the supervisor and was not doing anything to reprimand his officers for using excessive force or that showing ill will against Ford.   *Id.* at 75.   Ford also notes he had previously had problems with Corporal Stamps and Deputy Taylor.   *Id.*   Ford testified he asked to speak to Captain Guyll about the conduct of his officers but was not able to do so.   *Id.*   Ford believes Captain Guyll is liable for any force or physical violence that is used against inmates.   *Id.* at 77.   Ford also believes Captain Guyll is "training his officers to engage in such contact with inmates."   *Id.* at 76.

16

As to his personal capacity claim against Captain Guyll, Ford testified it was based on the fact that Captain Guyll failed to reprimand the officers or "pull[] . . . either officer away from" Ford.  *Id.* at 80.  Ford indicated that he had already filed grievances against Corporal Stamps and Deputy Taylor, but they were still allowed to come in and harass him.  *Id.* at 82.  Ford asserts that inmates only have access to one individual—the grievance officer—to complain about this type of conduct, and the grievance officer does not send the grievances up the chain of command.  *Id.*  Ford believes the jail's strict adherence to the chain of command serves to isolate the higher officers, so they do not learn about the incidents where excessive force or improper conduct occurs.  *Id.* at 82.  In Ford's view, if Captain Guyll did not know about the incident on July 11 involving him and many other officers, this meant that the "chain of command [was] not being met."  *Id.*  Ford conceded that Captain Guyll was not personally involved in this incident.  *Id.*

With respect to his official-capacity claim against the other named officers, Ford testified that they failed to act professionally and violated his rights by "forcing [him] to do something against [his] will.  Applying physical pain and abuse.  Verbally, physically, mentally."  *Id.* at 85.  Ford specified that the policy and procedure "states that they won't have physical contact with any individual unless they become the attacker."  *Id.*  Ford believes the officers he sued were violating this policy.  *Id.* at 85, 87.

### E.   Medical Records and Photographs of Injuries

Ford's medical records from July 11, 2019, indicate that a nurse was called to the booking area to examine him after the altercation with jail staff.  (Doc. 34-4 at 1).  The deputies reported that Ford's facial piercing was bleeding.  *Id.*  When the nurse approached Ford, he stated: "Don't f------ touch me."  *Id.*  About an hour later, a nurse

examined Ford because he was reporting pain in his left hand. *Id.* Obvious swelling

was noted, and an x-ray was ordered. *Id.* The x-ray showed no fracture or dislocation

and "[n]o appreciable soft tissue swelling" was seen. *Id.* at 2. When the results were

relayed to Ford, he refused to speak to the nurse or indicate if he understood the x-ray

results. *Id.* at 1.

The photographs taken of Ford's injuries show the following:

Photograph 1 is of the right side of Ford's face. There is an abrasion from
his eyebrow extending horizontally almost to the hairline. There is also an
area of redness under his right eye, extending from the eyebrow vertically
up to the hairline, and on the left side of his nose. No blood can be seen
on this photograph. (Doc. 51-3 at 1).

Photograph 2 is of the left side of Ford's face. There is a large abraded
area on his cheek around his dermal and blood is evident around the base
of the dermal. Ford's forehead, ear, side of his nose, side of his neck,
above his upper lip, and his cheek all exhibit significant redness. *Id.* at 2.

Photograph 3 is of the left side of the back of Ford's head and neck. There
is an abrasion on his neck just above the collar of his uniform extending
upwards and to the left for approximately three inches. The side of his
neck, his ear, and the area behind his ear are red. *Id.* at 3.

Although Ford believes that jail staff also took photographs of his wrists, no such

photographs were submitted to the Court.

### F.   Grievances and Disciplinary Citation

On July 12, 2019, Ford filed a grievance stating he had been assaulted on July

11th by multiple guards while he was handcuffed. (Doc. 34-3 at 1). He stated he had

been kicked in his face by a knee and "kneed in the face to the point [he] was bleeding

out of my dermal." *Id.* Ford indicated he had pictures taken. *Id.*

On July 23, 2019, Ford submitted another grievance regarding the July 11th

incident. *Id.* at 3. Ford stated that Deputy Taylor violated his Eighth Amendment rights

by grabbing his jaw as he was being put in the restraint chair.  *Id.*  Ford indicated that Deputy Taylor applied pressure under his jaw to keep him from speaking.  *Id.*  Ford contended this was an excessive use of force.  *Id.*

Ford submitted another grievance that same day about Deputy Price.  *Id.* at 4. Ford asserted that Deputy Price violated his rights by taking him out of the pod and "using foul language in a[n] ag[g]ressive manner."  *Id.*  Ford stated that Deputy Price failed to act in a professional manner.  *Id.*  Further, Ford asserted that while he was handcuffed, Deputy Price "slammed" his face in the ground and used his body weight to hurt him.  *Id.* Ford believed this was an unlawful use of force.  *Id.*

Ford was issued a disciplinary citation for assault and battery or threatening or intimidating another person, active resistance to jail staff, and disruptive conduct.  (Doc. 34-2 at 4).  Ford entered a plea of guilty.  *Id.* at 5.  He admitted to having resisted the officers and to cursing.  *Id.*  He lost his commissary, games, telephone, and visitation privileges.  *Id.*  He was given forty days of disciplinary segregation as punishment.  *Id.*

## II.   LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   DISCUSSION

Defendants have moved for summary judgment on the following grounds: (1) the force used against Ford was objectively reasonable in light of the circumstances confronting the Defendants; (2) verbal threats fail to state a constitutional violation; (3) there is no evidence of a failure to train or supervise; and (4) there is no basis for official-capacity liability.

### A.   Excessive Force

The objective reasonableness standard applies to excessive-force claims brought by pretrial detainees. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "[T]he defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 394. A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396.

The objective reasonableness of a use of force "turns on the 'facts and

circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Additionally, "[a] court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

"[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham* 490 U.S. at 396). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective. *Id.* at 398-99.

Ford first contends he should not have been called out of the pod by Corporal Stamps and Deputy Price and taken to the rec yard. Ford does not deny that he was making comments about an officer who entered the restroom to retrieve an inmate, but he claims he was not the only inmate making such comments. (Doc. 34-9 at 20). Ford contends that Corporal Stamps immediately began to scream in his face, and Ford did not respond. *Id.* at 21. Clearly, none of these events involved the use of physical force.

Once in the rec yard, Ford contends Corporal Stamps began using foul language. (Doc. 34-9 at 23).   Ford again refused to talk to Corporal Stamps.   *Id.*   According to Ford's testimony, when he was told by Corporal Stamps to "cuff up," Ford refused to turn around and offer his hands, so Corporal Stamps pushed him against the wall, applied pressure, and put the handcuffs on as tightly as he could.   *Id.* at 23-25.   No other use of force occurred in the rec yard.   *Id.* at 24.   Ford does not claim that he complained that the handcuffs were fastened too tightly or that he asked for the cuffs to be loosened. Further, it is clear from the video evidence that Ford's own actions *after* he was handcuffed could very well have caused the minor injuries to his wrists.

"Handcuffing inevitably involves some use of force," *Wertish v. Krueger,* 433 F.3d 1062, 1067 (8th Cir. 2006), "and it will almost always result in some irritation, minor injury, or discomfort where the handcuffs are applied," *Chambers v. Pennycook,* 641 F.3d 898, 907 (8th Cir. 2011) (citation omitted).   Courts have found the application of handcuffs, even when tightly secured, standing alone, is not an unreasonable use of force.   *See Crumley v. City of St. Paul, Minn.,* 324 F.3d 1003, 1008 (8th Cir. 2003); *Foster v. Metro. Airports Comm'n.,* 914 F.2d 1076, 1082 (8th Cir. 1990).

Next, Ford contends that Corporal Stamps pulled on Ford's shoulder and hurt him as he escorted him down the hallway.   The video shows Corporal Stamps holding Ford's right arm above the elbow as he escorted Ford down the hall.   There is no indication that Corporal Stamps was applying undue pressure or lifting Ford's arm to cause strain to the shoulder.   The still photograph below, taken from the video footage of the hallway, shows the manner in which Ford was being escorted by Corporal Stamps.



The video evidence also fails to corroborate Ford's claim that Corporal Stamps and Deputy Price used excessive force when carrying him after he went "limp" in the hallway. *See supra* p. 9 of this Opinion.   Both officers placed their arms under Ford's shoulders and lifted him in that manner.   *Id.*   Ford's arms were not pulled up and away from his body.   This method of lifting was only used while Ford was refusing to walk down the hallway.   Ford began walking again when he and the other two officers entered the control room.   The Court finds that there is no genuine, material question of fact as to whether unreasonable force was applied when the officers were lifting and carrying Ford down the hall.   Ford's own actions in refusing to walk necessitated the officers' use of some degree of physical force to move him along—but not an unreasonable degree.

The next issue is the force used to restrain Ford while he was in the control room prior to being placed in the restraint chair.   The use of force began at 7:06:58 with the officers struggling to restrain Ford.   The use of force was again prompted by Ford's

23

resistance to Corporal Stamps's and Deputy Price's actions in escorting him to segregation. The video evidence makes clear that the officers and Ford ended up on the floor because of Ford's actions. Once on the floor, it is also clear that Ford continued to struggle and resist the efforts of the officers to gain control of him. The officers applied pressure using the weight of their bodies. Ford's struggles continued even after other officers responded and offered assistance. At 7:09:01, Ford's legs were restrained. Just a short time later, at 7:10:43, Ford was lifted off the floor and placed in the restraint chair.

The Court of Appeals for the Eighth Circuit has refused to find that excessive force was used when officers used their body weight and other techniques to restrain an actively resisting inmate. *See, e.g., Wertish*, 433 F.3d at 1068 (rejecting excessive-force claim even though the officer forcefully threw the passively resisting plaintiff to the ground, pinned him down, and placed his weight on plaintiff's back before handcuffing him). Moreover, of note is the fact that Ford pleaded guilty to the disciplinary charge of assault and battery or threatening or intimidating another person, active resistance to jail staff, and disruptive conduct. (Doc. 34-2 at 5).

Finally, the Court considers Ford's claim of excessive force with respect to his time in the restraint chair. Ford was placed in the restraint chair at 7:10:46. Deputy Taylor held Ford's head and jaw for approximately a minute while Ford was being strapped in. Ford remained in the restraint chair until the restraints were removed at 7:54:53. A nurse was sent to assist Ford, but he refused to allow her to touch him. His restraints were checked and adjusted several times during this time period. Once Ford was secured in the chair, he was placed in the booking room within view of security cameras and multiple

officers.

The Court must view the use of force from the perspective of a reasonable officer on the scene while considering the interests that stem from the County's need to manage the detention facility. *Graham*, 490 U.S. at 396; *Bell*, 441 U.S. at 540. Ford does not contend that the use of the restraint chair violated the BCDC's policy. (Doc. 51-2). Given Ford's prior conduct, the use of the restraint chair until he had calmed down did not constitute excessive force. *See, e.g., Birdine v. Gray*, 375 F. Supp. 2d 874, 880-881 (D. Neb. 2005) (use of restraint chair to gain control of pretrial detainee did not constitute excessive force); *Ferrell v. Fitzpatrick*, 2020 WL 2220243, at *11 (D.S.D. May 7, 2020) (not clearly established that it constitutes excessive force to place a disruptive, activity resistant, and struggling pretrial detainee in a restraint chair where period of time held there was not especially lengthy); *Blevins v. Mollhoff*, 2020 WL 1048944, at *6 (D. Minn. Jan. 30, 2020) (no constitutional violation where inmate was being verbally disrespectful and actively, physically resisting officers effort to search him and then secure him in segregation cell); *Glaze v. Allen*, 2017 WL 2791190, at *5 (E.D. Ark. Feb. 27, 2020) (no constitutional violation where pretrial detainee was confined in a restraint chair after being argumentative and refusing an order to remove his clothing to be placed in a suicide gown).

In short, under the totality of the circumstances, whether Defendants' actions are considered singly or in combination, there are no genuine issues of fact as to whether the Defendants used excessive force against Ford.

### B.    Verbal Harassment/Abuse

Ford testified that when he refused to speak to Corporal Stamps in the rec yard,

Corporal Stamps began using foul and vulgar language.   (Doc. 34-9 at 23).   Later, when Ford was put in the restraint chair, he indicated that the verbal abuse began again with officers calling him a "bitch," a "punk," a "faggot," a "pussy," a "tough mother-----," and teasing and insulting him about his dermal.   *Id.* at 34, 37, 40, 42, 66.   Ford testified that the officers sat in the booking area laughing in his face and "talk[ing] shit to [him] the whole time."   *Id.* at 36, 66.   According to Ford, Deputy Vision and Deputy Taylor were the officers who verbally harassed him the most.   *Id.* at 37, 66, 68–69.

In general, "[v]erbal threats do not constitute a constitutional violation."   *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985).   Similarly, taunts, name calling, and the use of offensive language do not state a claim of constitutional dimension.   *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *see also Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) (abusive language or verbal harassment is not, by itself, unconstitutional and will not support a civil rights cause of action).   Moreover, fear or emotional injury which results solely from verbal harassment or idle threats is generally insufficient to constitute the violation of an identified liberty interest.   *King v. Olmsted Cnty.*, 117 F.3d 1065, 1067 (8th Cir. 1997)

A narrow exception to this general rule is recognized when a verbal threat rises to the level of a "wanton act of cruelty which . . . was brutal despite the fact that it resulted in no measurable physical injury to the prisoners."   *Burton v. Livingston*, 791 F.2d 97, 100 (8th Cir. 1986) (guard, using a racial epithet, pointed a cocked weapon at a black prisoner and told him to run so he could blow the prisoner's brains out).   The Eighth Circuit held that "a prisoner retains at least the right to be free from the terror of instant

and unexpected death at the whim of his allegedly bigoted custodians." *Id.*

Ford, in an apparent effort to fall within this narrow exception, argues that he had already "been beaten by the guards when the verbal harrassment [sic] began."   (Doc. 43 at 2).   "[D]ue to the pain and injury sustained," Ford maintains he "was in fear for his life, and verbal taunts or threats constitute 'terrorization.'"   *Id.*

Ford's allegations of verbal abuse do not approach the threshold established in *Burton*.   Assuming for purposes of this motion that Defendants used all the terminology credited to them by Ford, the remarks, while certainly unprofessional, rude, vulgar, and seemingly aimed at provoking a response from Ford, do not rise to the level of threats necessary to state a constitutional violation.   Defendants are entitled to summary judgment on this claim.

### C.   Due-Process/Official-Capacity Claim

Ford's due-process claim is against Captain Guyll.   Ford believes Captain Guyll was "allowing his officers to engage in physical harm against [pretrial] inmates."   (Doc. 34-9 at 74).   Ford maintains that Captain Guyll does nothing to reprimand his officers for engaging in physical violence and continues to allow them to consistently engage in conduct harmful to pretrial detainees.   *Id.* at 74–77.   Because Captain Guyll is the supervisor, Ford believes he is responsible for any use of force against inmate by the deputies.   *Id.* at 77.   Ford maintains that Captain Guyll is "not training his officers not to engage in physical violence with other individuals because there's violence going on."   *Id.* at 78.   Ford testified that he had altercations with officers on five separate occasions.   *Id.* at 79.   And with respect to at least one of those altercations, Ford was convicted of battery against an officer.   *Id.*

The Court has determined that Ford has not suffered an underlying constitutional violation.   Without evidence of such a violation, Benton County cannot be held liable. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir 2007) ("This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim.") (internal quotation marks and citation omitted).   Accordingly, this claim is subject to dismissal on summary judgment.

## IV.    CONCLUSION

For the reasons stated, the Defendants' Motion for Summary Judgment is **GRANTED,** and this case **DISMISSED WITH PREJUDICE**.   A separate judgment will issue concurrently with this Opinion.

**IT IS SO ORDERED** on this ___9th___ day of October, 2020.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT COURT